## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES FOR THE USE** | * | **CIVIL ACTION** |
| **AND BENEFIT OF SEMS, INC.** | * | |
| | * | |
| *PLAINTIFFS* | * | |
| | * | |
| **V.** | * | |
| | * | |
| **SLSCO LTD., AND TRAVELERS** | * | |
| **CASUALTY AND SURETY COMPANY OF** | * | |
| **AMERICA** | * | **JUDGE**_____ |
| | * | |
| | * | |
| *DEFENDANTS* | * | **MAG.**_____ |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## <u>COMPLAINT</u>

**NOW INTO COURT**, through undersigned counsel, comes the United States of America

for the use and benefit of SEMS, Inc. ("SEMS"), and for such complaint, avers as follows:

### PARTIES

1.

SEMS is a Louisiana corporation with its principal place of business in Baton Rouge,

Louisiana.

2.

Made defendants herein are:

a)  SLSCO LTD.("SLSCO"), which upon information and belief is a Texas limited

partnership with its principal place of business in Galveston, Texas; and

b) Travelers Casualty and Surety Company of America ("Travelers"), which upon information and belief is a foreign insurer licensed to do and doing business in the State of Louisiana with its principal place of business in Hartford, Connecticut.

## JURISDICTION AND VENUE

3.

Plaintiff's claim for relief is subject to 40 U.S.C. § 3133, *et seq*. (the "Miller Act"). Pursuant to 28 U.S.C. §1331, this Court has jurisdiction of this action.  Additionally, this action is on a payment bond under the Miller Act and pursuant to 28 U.S.C. § 1352, this Court has jurisdiction of this action.

4.

The construction project made the basis of this action is located in Bossier Parish, Louisiana, and a substantial part of the events or omissions giving rise to SEMS' claims occurred in this district. Therefore, venue is proper in this Court. 40 U.S.C. § 3133(b)(3); 28 U.S.C. § 1391(b).

5.

Because SEMS is a Louisiana corporation and the Project (as later defined herein) is located in Louisiana,  Section 18 of the Subcontract (as later defined herein), requiring: mediation to take place in Texas prior to SEMS filing suit; that the Subcontract be governed and construed in accordance with the laws of the state of Texas; and that venue  be proper only in state or federal courts situated in Galveston County, Texas, is null and void pursuant to La. R.S. 9:2779.

## BACKGROUND

6.

The NAVFAC Engineering Systems Command SE ("Navy" or "Owner"), as owner, contracted with SLSCO, as the general contractor, with respect to the construction project known as "Weapons Generation Facility (WGF) Early Site Work," Project No. N69545022C0016 (hereinafter referred to as "Project"). The contract executed by and between the Navy and SLSCO is referred to herein as the "Prime Contract."

7.

On or about May 23, 2022, SLSCO obtained from Travelers a Miller Act Bond identified as Bond No. 107615017 ("Bond"), for the use and benefit of all persons supplying labor, material and/or equipment in the prosecution of the Prime Contract work.[1]

8.

SEMS entered into a Subcontract with SLSCO (the "Subcontract") dated May 10, 2023, to furnish certain labor, material, and equipment for the Project.  The Subcontract also incorporated the Prime Contract. The original Subcontract amount was Four Hundred Seventy Thousand and No/100 Dollars ($470,000.00).

9.

Pursuant to Section 3iv of the terms of the Subcontract, SLSCO was obligated to pay SEMS within seven (7) days after receipt of payment from the Owner.

---

[1] Exhibit "A", Miller Act Bond.

10.

Pursuant to Section 4b of the terms of the Subcontract and FAR 52.236-2 (incorporated into the Subcontract through the Subcontract's flow down of the Prime Contract), SLSCO agreed to compensate SEMS for differing site conditions.

11.

Pursuant to Section 5a of the terms of the Subcontract, SLSCO was required to equitably adjust the Subcontract amount when SLSCO requires SEMS to perform additional work through a written change order.

12.

Pursuant to Section 2a of the terms of the Subcontract, SEMS was required to perform its scope of work in accordance with Exhibit B of the Subcontract.

13.

Exhibit B of the Subcontract sets forth SEMS' original scope of work under the Subcontract. In accordance with Exhibit B, after SEMS mobilized to the site, SEMS was required to "begin pumping operations necessary to dewater the AFFF Pond."

14.

In accordance with Exhibit B of the Subcontract, SEMS was required to treat all water pumped from the AFFF Pond utilizing remediation equipment. And once the water was treated, SEMS was to store the water in frac tanks onsite prior to onsite discharge. Pursuant to the Subcontract and Prime Contract, SEMS was required to obtain approval from SLSCO prior to discharging the stored water on site and to maintain a remediation system onsite at all times during dewatering activities.

15.

Pursuant to the Prime Contract's specification Section 02 61 13.01, sub-section 3.6.1, "it is assumed that water removed [from the AFFF Pond] shall be stored and tested on a daily basis. Enough storage would be maintained onsite to treat the next day's treatment while awaiting the previous days treated sampling results."

16.

Additionally, SEMS' original scope of work included flow filling and ccTV of the 21" pipe from within Building 7710.

17.

Pursuant to Section 6.0 of Exhibit B of the Subcontract, SEMS and SLSCO agreed that SEMS' original Subcontract price and scope of work included the rental of 4 frac tanks for one month, 4 laboratory samples, 1 roll off box, and one mobilization/demobilization.

18.

In accordance with the plain and express language of Exhibit B of the Subcontract, SLSCO agreed that SEMS' original Subcontract price was based on the assumption that the liner in the AFFF Pond was not damaged and in working order.

19.

Additionally, pursuant Section 02 61 13.01 of the specifications of the Prime Contract, the estimated quantity to dewater the AFFF Pond was based on the assumption "that the liner underlying the former AFFF Pond is intact enough to limit significant impacts from groundwater outside of the existing AFFF Pond."

20.

Change Order-001 ("CO1"), was included as "Attachment A" of Exhibit B of the Subcontract. Accordingly, CO1 was agreed upon by SEMS and SLSCO as it was incorporated and made a part of the Subcontract.

21.

Pursuant to CO1, SLSCO agreed to pay SEMS for certain additional costs incurred/work performed, including the costs of additional frac tanks above 4 ($5,550 per tank per month), additional laboratory samples over 4 ($1,225 each), for an additional roll off box above 1 ($10,275), and the cost for SEMS to perform any additional remobilization ($10,000).

**OUTSTANDING AMOUNTS OWED**

22.

All work performed by SEMS for the Project was performed in a timely, good, and workmanlike manner and in accordance with the Prime Contract and Subcontract.

23.

At the time of filing this Complaint, SEMS had performed work pursuant to the Subcontract totaling $663,823.01 for which SEMS requested payment through the following invoices/payment applications submitted to SLSCO.

| Invoice Date | Payment Application | Total Billed (Including Retainage) |
|---|---|---|
| 4/30/2023 | 63801- Pay App 01 | $35,000.00 |
| 5/31/2023 | 63939- Pay App 02 | $50,000.00 |
| 6/30/2023 | 64055- Pay App 03 | $121,650.00 |
| 7/31/2023 | 64366- Pay App 04 | $105,000.00 |
| 10/20/2023 | 230920AB-Pay App 05 | $352,173.01 |

24.

SEMS' performance of work totaling $663,823.01, represents a value of $233,500 for original scope of work performed by SEMS and $430,323.01 for change order work performed by SEMS. The foregoing figures do not include amounts for interest, attorney's fees, and court costs, of which SEMS is entitled.

25.

The following outlines the portions of SEMS' original scope of work completed to date:

| Description of Work | Percent Complete | Total Cost |
| --- | --- | --- |
| Pre-Mobilization Submittals | 100% | $35,000.00 |
| Mobilization | 100% | $50,000.00 |
| Demobilization | 100% | $10,000.00 |
| Dewatering & Treat | 100% | $40,000.00 |
| Piping Abandonment & Housing Demo | 0% | $           - |
| Berm Removal | 50% | $37,500.00 |
| Install Geotextiles | 50% | $25,000.00 |
| HDPE Liner Installation and Anchoring | 0% | $           - |
| Backfill Dewatering Pond | 0% | $           - |
| Sampling and Analysis | 100% | $18,000.00 |
| Waste Removal | 100% | $18,000.00 |

26.

At the time of filing this Complaint, SLSCO has only paid SEMS $202,550. Because of SLSCO's payment practices, it is impossible to determine how much of the amounts paid by

SLSCO to date, represent SLSCO's payment for SEMS' performance of its original scope of work versus change order work.

27.

SLSCO owes SEMS $461,273.01, in addition to interest, costs, and attorney's fees.

28.

SEMS performed extra work on the Project which was reflected in four change orders. CO1 and Change Order-002 ("CO2") were approved and signed by SLSCO. Change Order-003 ("CO3") and Change Order-004 ("CO4") have not been approved nor rejected by SLSCO. SLSCO has issued no formal response to SEMS' submission of CO3 and CO4.

29.

As of the date of filing this Complaint, SLSCO has yet to formally notify SEMS the reasons for withholding any payments due SEMS.

30.

Prior to SEMS mobilizing to the Project site, all of SEMS' pre-mobilization submittals were approved. On or about June 6, 2023, SEMS completed mobilization activities and began to pump and treat the AFFF Pond waters.

31.

Upon information and belief, by June 15, 2023, SEMS completed a portion of its scope referred to as dewatering and treating of the AFFF Pond, which was verified by SLSCO and captured in SEMS' daily logs. Upon information and belief, after SEMS completed dewatering the AFFF Pond (on the same date of June 15, 2023), SEMS first noticed that the AFFF Pond's liner was damaged, which subsequently caused the AFFF Pond to refill with water.

32.

On the same date SEMS noticed the AFFF's Pond liner damage (6/15/23) SEMS immediately notified SLSCO in writing of the liner damage and further informed SLSCO that SEMS' anticipated incurring delays and additional costs because of this changed condition before continuing dewatering the water refilling into the pond.

33.

SEMS, as previously authorized through CO1 and through communications with SLSCO, delivered to the Project site, more than 4 frac tanks, 2 roll of boxes, and conducted more than 4 laboratory samples.

34.

 SLSCO authorized SEMS to have 6 frac tanks on site in June; 10 frac tanks on site in July; 10 frac tanks on site in August; and 5 frac tanks on site in September. SEMS original scope of work and Subcontract amount included only the costs of 4 frac tanks on site for one month. Per the mutually agreed upon CO1, SLSCO was obligated to pay SEMS for the "Cost for additional frac tanks (above 4)…[at the rate of ] $5,500 per tank per month."

35.

As previously authorized through CO1 and SLSCO, SEMS conducted 10 laboratory samples (SEMS' original scope included taking only 4 lab samples); and transported to the site, and disposed of 2 roll off boxes (SEMS' original scope of work included the costs of transportation and disposal of 1 roll of box).

36.

Pursuant to CO1 SLSCO agreed to pay SEMS $1,225 for each additional laboratory sample (over 4) and $10,275 for the cost for transportation and disposal of each roll off box (over 1).

37.

SEMS is entitled to at least $189,675 for the costs of performing the change order work authorized by SLSCO pursuant to CO1.

38.

CO2 included the "Clear Zone" scope of work. The "Clear Zone" scope of work set forth in CO2 was not a part of SEMS original scope of work. CO2 was signed by authorized representatives of SLSCO and SEMS for a total amount of $398,067.

39.

After the parties executed CO2, on or about June 22, 2023, SLSCO emailed SEMS to mobilize immediately to start performing the CO2 work. As a result, SEMS purchased materials necessary to carry out CO2 scope of work. On or about July 10, 2023, SEMS mobilized its civil crew to the Project site to begin CO2 scope of work.

40.

However, on July 14, 2023, SEMS received notice from SLSCO recommending SEMS to demobilize from the Project site because there was no work for SEMS to perform on the AFFF Pond at that time and the Project site was not prepared to receive CO2 work. Therefore, regardless of whether SEMS performs the remainder of the CO2 scope of work, SEMS is owed $29,536 for purchasing and storing materials and performing an additional mobilization and demobilization for CO2 work as authorized and directed by SLSCO.

41.

In addition to amounts owed for SEMS performance of its original scope of work, CO1 and CO2 work, SEMS is also owed amounts previously requested through CO3 and CO4 resulting from differing site conditions and delays to SEMS' work caused by SLSCO.

42.

On or about June 12 and June 13, 2023, SEMS requested entrance into Building 7710 with the anticipation to begin drain verification and pipe filling as referenced in the CA-C550, drawing 15161431, sheet 1 immediately upon completion of treating the AFFF Pond waters. SEMS estimated that it would complete the AFFF Pond dewatering on June 15, 2023, and would immediately transition to pipe verification and filling. This was communicated to SLSCO.

43.

Upon information and belief, prior to SEMS proceeding with pumping the water that refilled into the AFFF Pond because of the pond liner damage (differing site condition), SEMS notified SLSCO on June 15, 2023, of the liner damage. On June 16, 2023, SEMS continued to treat waters that was refilling into the pond (due to the liner damage) with the expectation that SEMS would quickly fill the pipe and transition to pond filling scope of work.

44.

The underlying liner damage to the AFFF Pond constituted a differing site condition as this condition was not ascertainable from a reasonable inspection prior to SEMS commencing its work for the Project. The damaged condition of the AFFF Pond's liner was not reflected in any in any of the drawings or specifications for the Project - nor did the Prime Contract or Subcontract require SEMS to base its price on said condition. Instead, through execution of the Subcontract and CO1, SLSCO agreed that SEMS' price was based on the AFFF Pond liner being in working order.

45.

On or about June 26, 2023, SEMS was first notified by SLSCO that access to Building 7710 may not be granted without a work plan. Upon information and belief this was 13 days after

11

SEMS initially requested Building 7710 access and the first time SEMS was informed that access to Building 7710 was limited.

46.

Nonetheless, on or about June 26, 2023, SEMS immediately provided a drainpipe plan for Building 7710 that requested a minimum 1 week of access to Building 7710 to visually inspect the 21-inch building drainpipe. On or about June 27, 2023, SEMS was provided access to Building 7710 but was told that no work on the pipes from the building will be authorized or allowed.

47.

Prior to SEMS receiving this communication, no plans of breaking pipe outside the building, were discussed, planned or considered by SLSCO or SEMS. On or about July 3, 2023, SEMS submitted its pipe filling work plan and AHAs.

48.

On or about July 9, 2023, SEMS submitted laboratory analytical reports for 4 frac tank samples and recommended the release of the waters contained in said frac tanks.

49.

Upon information and belief, from June 16, 2023, through July 13, 2023, SEMS proceeded as the Subcontract and SLSCO directed to dewater the AFFF Pond and treat the water refilling into the AFFF Pond. Upon further information and belief, all work performed by SEMS through the foregoing dates, including but not limited to the costs of labor, per diem, and equipment costs, is considered change order work resulting from a differing site condition (the damaged liner in the AFFF Pond). Further, SLSCO observed SEMS performance of the foregoing change order work but never once directed SEMS to stop its work.

50.

At the recommendation of SLSCO, SEMS demobilized from the Project site on July 14, 2023, as there was no work left for SEMS to complete on this date. SEMS notified SLSCO that, the remediation system (to treat the water from the AFFF Pond), must remain on site (as required by the Subcontract and Prime Contract) and an additional $50,000 mobilization will be required when SLSCO directs SEMS to remobilize to the Project site to release frac tank waters. SEMS' original scope of work included the cost of the remediation system for one month and 1 mobilization/demobilization.

51.

On or about July 20, 2023, at the request of SLSCO, SEMS emailed a timeline to SLSCO explaining the changes in scope. On or about July 21, 2023, SEMS submitted Change Order-003 ("CO3") for costs SEMS incurred up to that date resulting from the differing site conditions, which included support documentation to support the amounts claimed in CO3 and a detailed timeline of events.

52.

On or about July 24, 2023, a meeting was held between SLSCO and SEMS whereby the parties discussed CO3 and everyone understood the amounts claimed in CO3. Despite this understanding no further authorization of CO3 by SLSCO was provided by SLSCO.

53.

On or about July 26, 2023, SEMS again requested from SLSCO in writing reimbursement of the costs SEMS incurred under CO1, CO2, and CO3. SEMS notified SLSCO again that the remediation system cannot be taken off of rent per the terms of the Prime Contract and Subcontract and that SEMS would continue to incur costs monthly for the rental of the system.

54.

On or about July 28, 2023, SEMS was provided authorization to begin the Drainpipe Filling scope which was more than 20 days after SEMS submitted its request to perform this scope to SLSCO. On this same date, SEMS was provided authorization to release 4 frac tanks but no location was provided by SLSCO to release said frac tanks. In addition, on this same date, SEMS submitted two additional lab reports for SLSCO's immediate release approval.

55.

On or about July 31, 2023, SEMS was provided authorization to release 4 frac tanks into a sewerage manhole which authorization was more than 20 days from SEMS' initial request. Section 3.6.1 of the Prime Contract specifications implied a 2-day authorization period after SEMS' submission of the lab results to SLSCO, to release the treated waters.

56.

On or about August 3, 2023, SEMS emailed SLSCO to follow up on the status of outstanding Change Orders 1-3. SEMS also provided a schedule to SLSCO with a remobilization date of August 7, 2023.

57.

On or about August 7, 2023, SLSCO recommended SEMS to remobilize to site to only release 6 frac tanks onsite stating, "Recommend SEMS remobilize under the agreed upon contract price in order to release the frac tanks…This will stop some of the immediate bleeding. We anticipate requesting an equitable adjustment (REA) from NAVFAC in the coming weeks." In response, SEMS stated it would continue assisting SLSCO to package the change orders and further stated that it can mobilize to the site in 1 day after receiving formal authorization from SLSCO.

58.

On August 8, 2023, SEMS followed up with SLSCO stating "…SEMS can mobilize quickly to keep this project moving forward." In a response email, SLSCO stated "…to be clear, what we requested on email…was remobilization to drain the frac tanks only, at the contracted rate associated with delay of laboratory analytics…Looking in to the frac tank change order now." In response, SEMS recommended a full remobilization and stated that the rental cost of the remediation system is ongoing.

59.

On or about August 11, 2023, after receiving no response from SLSCO to SEMS' outstanding change order requests, SEMS sent a formal change order demand letter to SLSCO. This demand letter restated the timeline events, the change order costs incurred to date by SEMS, and stated that if no formal response to Change Orders 1-3 were received from SLSCO by 8/16/23, SEMS "will assume SLSCO intends to further delay the project and is in breach of contract."

60.

Receiving no meaningful response to SEMS' 8/11/23 demand letter, SEMS sent SLSCO another letter dated 8/22/23, stating its intentions to mobilize to the Project site to continue in scope and previously authorized work (discharging water from frac tanks).

61.

Through another letter dated August 23, 2023, from SEMS to SLSCO, SEMS made another formal demand to SLSCO to pay SEMS for the amounts outstanding and owed for its performance of the work up to date and requesting payment in full within 14 days.

62.

On or about August 24, 2023, SEMS mobilized back to the Project site to proceed with previously authorized work including discharging water from various frac tanks on-site.

63.

On or about August 29, 2023, SEMS sent a "Notice of Demobilization Letter" to SLSCO, confirming that no formal responses to Change Orders 1-3 were received from SLSCO and further stated that if no response was received for all Change Orders within 48 hours, SEMS will begin demobilization from the Project site, including the remediation system.

64.

On or about August 30, 2023, SLSCO called SEMS to request SEMS to update CO3 to include projected costs through September 30, 2023. In response, SEMS immediately submitted a revised CO3 reflecting projected costs through September 30, 2023, with detailed support documentation.

65.

After SEMS' submission of the revised CO3, SLSCO never responded to SEMS' revised CO3 or Notice of Demobilization Letter. As a result of receiving no direction from SLSCO and having no further authorized work to perform at the Project site, SEMS demobilized from the Project site on or about September 12, 2023. To date, SEMS has not been authorized or directed by SLSCO to perform any remaining work, including change order work, under the Subcontract.

66.

This additional demobilization led to SEMS' submission of CO4, entitling SEMS $10,000 to perform this additional demobilization activity.

67.

On or about October 10, 2023, SEMS submitted its formal demand to Travelers, SLSCO's surety for the Project. In this demand, SEMS included comprehensive support documentation.

68.

Despite already having sufficient support documentation to substantiate SEMS' bond claim, Travelers requested SEMS to provide additional documentation. On or about November 16, 2023, SEMS again submitted documentation requested by Travelers.

69.

As of the date of filing this Complaint, Travelers has failed to either reject or accept SEMS' bond claim.

70.

More than 90 days and less than a year have elapsed since SEMS last furnished the labor, material, and/or services for which SEMS' Miller Act claim is made.

## COUNT I - MILLER ACT CLAIM

71.

SEMS adopts and incorporates by reference all prior allegations in this Complaint.

72.

SLSCO and Travelers are obligated, pursuant to the (payment) Bond and the Miller Act, specifically 40 U.S.C. § 3133, to pay SEMS for the labor, material, and/or services SEMS furnished and for which SLSCO has failed to make payment.

73.

The amounts for which SEMS seeks payment from SLSCO and Travelers under the Bond relates to labor, material, and/or services provided by SEMS in prosecution of its work on the Project.

74.

SLSCO and Travelers have not satisfied their obligations under the Bond and Miller Act to pay SEMS for the labor, material, and/or services that SEMS furnished.

## COUNT II – BREACH OF CONTRACT

75.

Paragraphs 1 through 70 are incorporated herein by this reference.

76.

SLSCO has failed to pay SEMS the principal amount of $461,273.01 owed pursuant to the Subcontract for the work, materials, and services furnished by SEMS.

77.

Pursuant to Section 19 of the terms of the Subcontract, the prevailing party in any suit is entitled to recover reasonable and necessary attorney's fees and litigation expense in addition to any other relief granted by this court.

78.

SLSCO's failure to pay SEMS the amounts owed under the Subcontract is a breach of the Subcontract, entitling SEMS to damages in the amounts of $461,273.01, plus all costs, attorney's fees, litigation expenses, and interest for which SEMS is or may be entitled to under the Subcontract, Prime Contract, and applicable law.

79.

SEMS further asserts all additional rights against SLSCO that SLSCO may have against the Owner under the Prime Contract, including entitlement to additional costs, expenses, damages, and/or attorney's fees.

## **COUNT III – BREACH OF TERMS AND CONDITIONS OF BOND**

80.

Paragraphs 1 through 70 are incorporated herein by reference.

81.

Travelers failed to pay SEMS pursuant to the terms and conditions of the (payment) Bond.

82.

The foregoing failure is a breach of Travelers' obligations under the (payment) Bond.

83.

The (payment) Bond entitled SEMS to a right of action against Travelers for the amounts owed by SLSCO to SEMS as a result of SLSCO's failure to compensate SEMS.

84.

Because there remain amounts due and owing by SLSCO to SEMS pursuant to the Subcontract and Prime Contract, and SLSCO has not paid SEMS said amounts for provision of labor, material, and/or services in the prosecution of its work under the Subcontract in the amount of $461,273.01 to SEMS, Travelers failed to comply with the terms and conditions of the Bond.

## **COUNT IV – FAILURE TO COMPLY AND PAY PURSUANT TO FAR 52.232-27**

85.

Paragraphs 1 through 70 are incorporated herein by reference.

86.

The Subcontract incorporates FAR 52.232-27. FAR 52.232-27 and the Subcontract requires SLSCO to issue payment to SEMS within seven (7) days after SLSCO's receipt of payment from the Owner for the work performed by SEMS.

87.

Pursuant to FAR 52.232-27 and the Subcontract, SLSCO is required to notify SEMS in writing of any withholding of payment and said written notice must specify: 1) the amount to be withheld; 2) the specific causes for the withholding under the terms of the Subcontract; and 3) the remedial actions to be taken by the subcontractor in order to receive payment of the amounts withheld.

88.

Upon information and belief, SLSCO has been paid by the Owner for work, materials, and/or services supplied by SEMS for the Project but SLSCO has failed to make corresponding payment(s) to SEMS within seven (7) days of receipt of such funds.

89.

Because SLSCO did not make payment to SEMS in accordance with FAR 52.232-27 and the Subcontract, SEMS is entitled to interest in accordance with FAR 52.232-27 beginning on the period on the day after the required payment date and ending on the date on which SLSCO remits payment to SEMS for amounts due, computed at the rate of interest established by the Secretary of the Treasury, and published in the Federal Register, for interest payments under 41 U.S.C. 7109 in effect at the time SLSCO accrues the obligation to pay the interest penalty.

90.

Further, it has been over six, five, and two months since SEMS submitted various applications for payment to SLSCO that have remained unpaid. Because SLSCO has yet to notify SEMS in writing of the reasons it has withheld payment for the foregoing SEMS' applications for payment, SLSCO is in direct violation of FAR 52.232-27 and the Subcontract which also results in SLSCO being in breach of contract.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, the United States of America for the use of Southern Environmental Management and Specialties, Inc. ("SEMS") prays that, after due proceedings are had, judgment be rendered in its favor and against, SLSCO LTD., and Travelers Casualty and Surety Company of America, for the principal amount of $461,273.01, plus interest, costs, litigation expenses, statutory penalties, and attorneys' fees and for all other general or equitable relief that the Court deems appropriate.

Respectfully submitted:

**RIESS LeMIEUX, LLC**

_/s/Christopher K. LeMieux_
Christopher K. LeMieux (#27838)
Jace M. Weber (#40658)
1100 Poydras Street, Suite 1100
New Orleans, Louisiana 70163
Telephone:  (504) 581-3300
Facsimile:  (504) 581-3310
Email: clemieux@rllaw.com
Email: jweber@rllaw.com
_**Attorneys for Plaintiff, SEMS**_

SERVICE INSTRUCTIONS ON NEXT PAGE

**<u>PLEASE SERVE:</u>**
SLSCO LTD.
*Through its agent for service of process:*
Incorp Services, Inc.
3867 Plaza Tower Dr., 1st Floor
Baton Rouge, LA 70816

AND

Travelers Casualty and Surety Company
Louisiana Secretary of State
8585 Archives Avenue
Baton Rouge, LA  70809